# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 09-2076

———————

Kimberly A. Halverson,

        Appellant,

    v.

Michael J. Astrue, Commissioner of
the Social Security Administration,

        Appellee.

\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the
\* Eastern District of Arkansas.
\*
\*
\*
\*

———————

Submitted: January 14, 2010
Filed: April 2, 2010

———————

Before MURPHY and BYE, Circuit Judges, and GOLDBERG,[1] Judge.

———————

BYE, Circuit Judge.

Kimberly Halverson appeals the district court's[2] order affirming the decision of an administrative law judge (ALJ) denying her claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Halverson contends the ALJ improperly discounted medical evidence favoring her claim, erred in

———————

[1]The Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

[2]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

assessing her credibility, and improperly rejected her supplemental evidence. We affirm.

I

Kimberly Halverson was born in 1961. She has two years of education beyond high school and has worked as a receptionist, waitress, administrative clerk, and bill sorter. On June 16, 2004, Halverson filed for disability benefits, citing a disability onset date of September 25, 2003, and alleging she was disabled due to depression, anxiety, and agoraphobia.[3]

Since 2001, Halverson has been treated by various mental healthcare professionals for psychological and emotional problems reaching back to her childhood. According to Halverson, she grew up in a chaotic home with a mother who was neglectful, abusive and violent. She was required to tend to her own basic needs from a young age and to assume the role of parent for her younger sibling. She stated they would go without food for days at a time because her mother neglected to buy food. Halverson also recounted a series of abusive incidents, including being beaten for eating toast after school, being held down by her mother and threatened with a knife held to her throat, and watching her mother hold a loaded gun to a neighbor's head. Halverson also asserts she was sexually abused by a babysitter when she was five years old. As a result of these events, Halverson suffers from post-traumatic stress disorder (PTSD), generalized anxiety disorder, and major depressive disorder.

---

[3]Agoraphobia is a condition where the sufferer becomes anxious in unfamiliar environments where she perceives she has little control. Triggers for this anxiety may include wide open spaces, crowds, or traveling (even short distances). Agoraphobia is often, but not always, compounded by a fear of social embarrassment, as the agoraphobic fears the onset of a panic attack and appearing distraught in public.

-2-

From January 2002 through July 2003, Halverson received mental health counseling from Richard Joens, LISW. During this time, Joens assessed Global Assessment of Functioning (GAF)[4] scores between 57 and 59. Halverson reported she visited a friend and visited a co-worker at the co-worker's home. In May 2003, Halverson reported she "hate[d]" her job and the next month she went shopping as a distraction from the "drudgery" of her job. In July 2003, Halverson stated she was "relieved" to be spending time away from work.

On July 12, 2003, Halverson saw her treating psychiatrist Wesley D. Richardson, D.O., and reported "some" insomnia, but a mental status examination revealed no abnormalities and her mood was "relatively good." On September 18, 2003, she returned to Dr. Richardson, expressed concern over weight gain, and stated she had joined the gym at work. Halverson stated she "always [felt] dull," but Dr. Richardson noted she was alert and oriented with "good" grooming, normal speech, and normal thought processes. Dr. Richardson diagnosed generalized anxiety disorder with a GAF score of 60.

On October 1, 2003, Halverson reported being involved in a motor vehicle accident while on her way to a friend's house after work. She also reported being upset since her pet bird died, and was "stressed out" about her son who was recently released from prison and had been having seizures. On examination, Halverson's mood was "sad" but she was alert and oriented with "good" grooming, normal speech, and normal thought processes. Dr. Richardson assessed a GAF score of 52.

---

[4]The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness." See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed. 2000) (DSM-IV). A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). Id. at 34.

The next day, Halverson saw Joens and reported she was on leave from work under the Family Medical Leave Act for a month and attempting to qualify for short-term disability payments from her employer. Joens recommended she also apply for Social Security disability benefits. Halverson continued to receive mental health counseling from Joens through April 2006. During this period, Joens assessed GAF scores between 52 and 58.

On March 10, 2004, Halverson began mental health counseling with Alice Harberts, LISW. Harberts noted she "looked very nice," was "well dressed," and wearing make-up. Halverson saw Dr. Richardson a few times over the next several weeks, reporting varying moods and motivation levels. Dr. Richardson assessed GAF scores between 55 and 60.

On April 21, 2004, she told Harberts she had "mixed feelings" about applying for Social Security disability benefits. Halverson stated she needed the money but wanted to get better and return to work at "some point." Harberts noted she was "well groomed" and cooperative.

On July 8, 2004, she reported planning a camping trip with a friend. Halverson also stated she had "reached out" to some of the women who lived by her. Harberts also noted improvement in Halverson's condition. Three weeks later, Halverson reported joining the YMCA and had an appointment with a personal trainer. Harberts noted Halverson was "well" groomed and goal directed.

On September 27, 2004, she reported financial problems due to overspending. She had gained weight and had to purchase new clothes. Halverson stated she "always" ran out of money before her next check came and had to ask for loans from a friend. Harberts suggested she find places to "cut back" her spending. In October 2004, Halverson stated she had been denied Social Security disability benefits and

-4-

reported increased anxiety. She had not gone to the YMCA yet because she did not trust people and did not believe she could be safe around them.

In February 2005, Halverson stated she had recently broken her leg after falling on ice. She described her living situation with her roommate as "horrible." Harberts noted Halverson was "well" groomed and seemed motivated to make changes once she recovered from her broken leg. Harberts opined her depression and post-traumatic stress disorder prevented her from functioning to full capability.

On July 15, 2005, Halverson stated she was going to Dallas from July 27, 2005, through August 12, 2005. One week later, she indicated she was going to Florida for "several weeks" to see her son. On August 15, 2005, Halverson reported she had just returned from visiting her son in Florida and he had experienced seizures while she was there. In September 2005, Halverson complained she was not handling her money well and had chosen to buy something to make her feel better before paying her bills. She claimed she stayed in her room all day and watched television. Harberts noted she was "well" groomed with "good" eye contact, appropriate behavior, a "good" attention span and was "doing ok" in her interactions with others.

On October 31, 2005, Halverson reported she had been in a car accident and it would cost over $2,000 to repair the damage to her car. On February 6, 2006, Halverson stated she owed $30,000 in medical bills related to her leg fracture. She also said the long-term disability insurance from her employer was due to expire in March 2006, and she was waiting to find out whether she would be found eligible for Social Security benefits. On each of these visits, her mood was depressed and anxious but Harberts noted she was "well" groomed with "good" eye contact, her behavior was appropriate, she had a "good" attention span and was "doing ok" in her interactions with others.

On February 9, 2006, Halverson saw Michael Taylor, M.D.. Dr. Taylor noted her attire and make-up "border[ed] on the outlandish," but a mental status examination was "totally within normal limits." Dr. Taylor indicated Halverson's subjective complaints were "totally inconsistent" with the mental status examination, and he opined that a diagnosis of borderline personality disorder should be considered. On April 20, 2006, Halverson again saw Dr. Taylor and reported decreased concentration, immediate recall, interest level, and energy level. She also reported moderately increased anxiety. Her mental status examination was within normal limits.

On May 3, 2006, Dr. Taylor completed a Mental Residual Functional Capacity Questionnaire indicating Halverson's current GAF score was 40 and her highest GAF score for the past year was 40.[5] He noted she had difficulty completing daily self-care tasks, rarely left her home, and could not sleep, remember, concentrate, or get along with others. Dr. Taylor opined Halverson was seriously limited but not precluded in her ability to understand, remember, and carry out very short and simple instructions, interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and travel in unfamiliar places. He concluded she was unable to meet competitive standards with respect to her ability to remember work-like procedures, maintain attention for two hour segments, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, and make simple work-related decisions, among other job-related tasks she was unable to perform. Dr. Taylor further opined Halverson would be absent from work more than four days per month.

Halverson testified at the administrative hearing held on May 10, 2006, and stated she had major depressive disorder, anxiety, PTSD, and agoraphobia. She further testified she had experienced her mental impairments since childhood and had

[5]A GAF of 31 through 40 is characterized by some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. See DSM-IV at 34.

a history of childhood abuse, resulting in nightmares and flashbacks related to her abuse. Halverson stated she experienced depressive symptoms, including crying spells, a loss of interest in "life," weight gain, "low" mood and energy level, and feelings of fear and suspicion when around other people. She also stated she experienced racing thoughts and had difficulty with concentration and memory. Halverson testified she experienced anxiety, constantly felt tense, was "hypervigilant" and always "watchful."

Halverson testified she stopped working in September 2003 due to her mental impairments, which resulted in absenteeism, difficulty completing a workday, difficulty getting along with co-workers, and difficulty completing tasks. She reported being terminated from her previous job because she was "overwhelmed" with the amount of work expected of her and she was unable to concentrate and follow changes in work rules. Halverson further stated she engaged in few daily activities other than watching television, listening to music, and doing "minimal" housecleaning. She claimed difficulty leaving her house, stayed in her bedroom 24 hours per day unless she had a medical appointment, and lacked the motivation and energy to maintain her personal hygiene.

A vocational expert also testified at the administrative hearing. The ALJ asked the vocational expert to assume a hypothetical claimant of the same age, education and work experience as Halverson who was limited to simple, routine, repetitive work involving no more than superficial interaction with the public and co-workers. The hypothetical claimant could not perform work involving a very fast mental pace, strict deadlines, directing others, handling emergency situations, or handling complaints. Additionally, the hypothetical claimant could not be closely supervised or have frequent change of instructions. In response, the vocational expert testified the individual would be able to perform the jobs of photo copy machine operator, order caller, document preparer, and table worker.

Following the administrative hearing, the ALJ denied Halverson's claim for benefits. The ALJ reviewed the medical evidence which both supported and detracted from her claim and concluded she was not disabled from performing substantial gainful employment. In particular, the ALJ discounted Dr. Taylor's functional capacities evaluation because it conflicted with his earlier examinations and those of other mental health professionals who repeatedly reported Halverson's mental examinations were unremarkable and her demeanor and appearance appropriate. The ALJ also discounted Dr. Taylor's GAF score of 40 because it conflicted with the numerous GAF scores between 50-60. The ALJ noted a psychological examination by Beverly Westra, Ph.D., which indicated Halverson was markedly limited in her abilities to understand, remember, carry out instructions, maintain regular work attendance, interact with co-workers and the public, etc. Nonetheless, he discounted the report because it was largely based on a written evaluation from one of Halverson's employers and not Westra's personal observations. Additionally, the ALJ found some of Halverson's testimony at the administrative hearing less than credible. For example, Halverson testified she had great difficulty maintaining concentration and focusing her thoughts. At the hearing, however, she testified for an extended period of time, was able to clearly articulate her thoughts, and testified coherently and in considerable detail. The ALJ also found her complaints of employment related difficulties inconsistent with her ability to travel, visit friends, go shopping, attend frequent medical/mental health appointments, and care for her activities of daily living. Finally, the ALJ concluded her need for money and dislike of the "drudgery" of work suggested Halverson's application for benefits was partially driven by a desire for secondary gain.

On review of the ALJ's decision, the district court affirmed the denial of benefits. The district court also held that additional evidence presented to the district court, e.g., her long-term disability insurance claim file, should have been presented to the ALJ and could not be considered for the first time on appeal. Alternatively, the district court concluded the additional information was essentially the same

information considered by the ALJ and would not have changed his benefits decision. Halverson timely appealed the district court's decision.

## II

We review de novo a district court's denial of social security benefits. Travis v. Astrue, 477 F.3d 1037, 1040 (8th Cir. 2007). The court's task is to determine whether the ALJ's decision "complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

> Substantial evidence is merely such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Substantial evidence on the record as a whole, however, requires a more scrutinizing analysis. In the review of an administrative decision, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (citing Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Id. at 879 (citing Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).

In order to qualify for benefits under the Social Security Act and the accompanying regulations, an individual must be disabled. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Disability is defined as the inability 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" Id.

(quoting 42 U.S.C. § 1382c(a)(3)(A)). To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work. Travis, 477 F.3d at 1040 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)). In this case, the ALJ determined Halverson was unable to perform past relevant work as a receptionist, waitress, administrative clerk, and bill sorter. However, the ALJ concluded there was other work she could perform, such as a document preparer, table worker, photocopy machine operator, and order caller. As a result, the ALJ determined she was not disabled and was not entitled to benefits.

## A. The ALJ's Decision to Discount the Treating Physician's Opinion

Halverson first argues the ALJ did not properly consider the medical evidence from her treating psychiatrist, Dr. Michael Taylor. "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Id. When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002).

Dr. Taylor diagnosed Halverson with major depressive disorder, generalized anxiety disorder, and PTSD. According to Dr. Taylor, Halverson's prognosis was poor and she was unable to perform a number of job-related tasks essential in the average workplace. Halverson contends the ALJ improperly discounted Dr. Taylor's opinions when it determined the medical records did not generally support Dr.

-10-

Taylor's conclusions. Halverson also asserts the ALJ relied exclusively on the February 2006 office visit, during which Dr. Taylor noted Halverson's attire and makeup bordered on outlandish, and her mental status examination was "totally inconsistent with her subjective complaints." Halverson contends this was only the second time she had visited Dr. Taylor, and his assessment of her impairments changed significantly in subsequent visits in March and April 2006 as he came to know her better. Finally, Halverson argues it was inappropriate for the ALJ to strongly rely on Halverson's GAF scores to discount Dr. Taylor's opinions.

As recited above, there is considerable medical evidence demonstrating Halverson has moderate limitations resulting from her emotional and psychological problems. While Halverson's symptoms waxed and waned between appointments, for the most part she was attentive, alert, focused, and appropriate when examined. Indeed, nearly all of her mental status examinations revealed no abnormalities or were inconsistent with her complaints.

Additionally, the ALJ properly explained his bases for discounting the two reports suggesting Halverson would be unable to maintain consistent employment. After evaluating Dr. Taylor's opinions regarding Halverson's abilities, the ALJ determined his opinions were not entitled to weight because they were inconsistent with and unsupported by the medical evidence of record, including Dr. Taylor's own treatment notes. Travis, 477 F.3d at 1041 ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."); see also Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

Contrary to the extreme limitations assessed by Dr. Taylor in his Mental Residual Functional Capacity Questionnaire, multiple mental status examinations, including examinations performed by Dr. Taylor, revealed no abnormalities, and

Halverson was repeatedly noted to be alert and oriented with normal speech and thought processes. See Heino, 578 F.3d 873, 880 ("An ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence."). In Dr. Taylor's February 2006 examination, he noted Halverson's subjective complaints were "totally inconsistent" with her "normal" mental status examination. Similarly, in April 2006, Dr. Taylor determined Halverson's mental status was within normal limits despite her reports of increased anxiety and decreased concentration, immediate recall, interest level, and energy level.

Additionally, Dr. Taylor's functional capacities assessment indicated a GAF score of 40, but dozens of earlier examinations over a period of years indicated GAF scores between 52 and 60. While Halverson correctly states the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," see 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (Aug. 21, 2000), the GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning. Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the [residual functional capacity], it is not essential to the RFC's accuracy.").

In Pate-Fires, the claimant's total GAF score history indicated she was above 50 only four out of twenty-one times in a six-year period. Pate-Fires, 564 F.3d at 944. We noted the history of the GAF scores at 50 or below, taken as a whole, demonstrated the claimant had serious symptoms or serious impairment in social, occupational, or school functioning. Id. (citing DSM-IV at 32). As a result, we concluded that "[n]otwithstanding [the claimant's] one GAF score of 58, the record actually supports [the treating psychiatrist's] assessment she 'is not capable of participating in gainful employment.'" Id. The same principle holds true in the converse in this case. The history of GAF scores between 52 and 60, taken as a whole, indicate Halverson has moderate symptoms or moderate difficulty in social or

occupational functioning.  See DSM-IV at 34.  The ALJ applied the correct legal standard in evaluating Dr. Taylor's opinion, and the ALJ's decision not to rely on the one GAF score of 40 was supported by the substantial evidence in the record, as described above.  See Juszczyk v. Astrue, 542 F.3d 626, 632-33 (8th Cir. 2008) (holding the ALJ's decision not to rely on the treating physician's GAF assessment was supported by substantial evidence where the assessment was extreme in light of the contradictory medical evidence); Goff, 421 F.3d at 791 (noting the ALJ was not compelled to give controlling weight to the physician's opinion where the GAF assessment of 58 was inconsistent with the physician's opinion that the claimant suffered from extreme limitations); Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 666-67 (8th Cir. 2003) (concluding the ALJ's decision that the GAF ratings did not appear to reflect the claimant's abilities was supported by the record).

Under these circumstances, it cannot be said there is not substantial evidence to support the ALJ's decision.  Travis, 477 F.3d at 1042 ("As there is conflicting evidence on the record, the ALJ's determination that the physicians' opinions were not supported by objective medical evidence does not lie outside the available zone of choice.").  The ALJ noted the conflicting opinions regarding Halverson's ability to perform work activities and chose not to give controlling weight to Dr. Taylor's opinion.  Heino, 578 F.3d at 880.  Nor can it be argued the ALJ did not properly consider favorable evidence or fail to explain his reasons for discounting that evidence.  Substantial evidence in the record as a whole supports the ALJ's decision.

## B.  The ALJ's Credibility Determinations

We next address Halverson's claim the ALJ erred in assessing her credibility. We set forth the standard courts should follow when evaluating subjective complaints in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  In Polaski, we held the ALJ must consider "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication;

precipitating and aggravating factors; and functional restrictions." Medhaug v. Astrue, 578 F.3d 805, 816 (8th Cir. 2009) (citing Polaski, 739 F.2d at 1322). Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence. Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008). The ALJ is not required to discuss each Polaski factor as long as "he acknowledges and considers the factors before discounting a claimant's subjective complaints." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Goff, 421 F.3d at 791).

In this case, the ALJ weighed the Polaski factors and concluded Halverson's allegations were not fully credible for a number of reasons. "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Juszczyk, 542 F.3d at 632.

First, the ALJ concluded Halverson's actual activities demonstrated in the record were inconsistent with her allegations of disability. In her intake questionnaire completed as part of the disability application process, Halverson stated she was able to take care of her own personal needs and grooming, care for a pet, prepare her own meals, do laundry, change sheets, clean her house, iron clothing, vacuum, wash dishes, drive her car, run errands, go out alone, take out trash, wash her car, go shopping, manage her finances, watch television, and read occasional self-help books. The ALJ found these statements, combined with the statements she made to mental health care providers, demonstrated her ability to engage in a normal range of daily activities inconsistent with her statement of disability. Additionally, according to the ALJ, other statements suggested alternative motives on Halverson's part, such as her statement she viewed her job as "drudgery" and her acknowledgment that difficulties in her social relationships were part of the reason she missed work frequently.

-14-

"We have held that acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Heino, 578 F.3d at 881. Moreover, "acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." Medhaug, 578 F.3d 805. Cf. Reed v. Barnhart, 399 F.3d 917, 923-24 (8th Cir. 2005) ("[T]his court has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."). In this case, because the record contains several inconsistencies as to Halverson's disability, the ALJ did not err. Heino, 578 F.3d at 881. While Halverson argues the ALJ overstated the extent of her daily activities, the record indicates the ALJ's credibility assessment was proper. Mouser, 545 F.3d at 638 ("Although the ALJ may have overstated [the claimant's] daily activities, the record indicates that [the claimant] is generally able to care for himself.").

The ALJ also considered other inconsistencies in the record as a whole which undermined Halverson's credibility. Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008) ("An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole."). For example, the ALJ noted despite Halverson's claims she lacked motivation and energy to maintain her personal hygiene and grooming, her counselor's progress notes show she was always well-dressed and groomed. Halverson also noted she had difficulty leaving her residence, but she was able to travel to other towns and states to visit friends and relatives. The ALJ also acknowledged Halverson's shopping trip she took to cope with her work situation. In addition, despite Halverson's claim she had difficulties getting along with co-workers, the evidence showed she visited her co-workers after office hours. Halverson again argues the ALJ overstated some of these activities, such as finding her shopping trips to be so frequent that she had little money to pay her bills, despite there only being evidence of one shopping trip in the record. Halverson also asserts that, despite her initial intentions, she never actually went on some of the trips noted in the record.

-15-

Despite Halverson's contentions, there is substantial evidence in the record to support the ALJ's credibility determination in relation to the other inconsistencies in the record. These activities support the ALJ's finding that Halverson's impairments were not disabling. Heino, 578 F.3d at 881.

The ALJ concluded the medical records did not support Halverson's allegations of disability. The ALJ concluded her allegations concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with some of the medical evidence of record. Despite her claimed inability to work, multiple examinations demonstrated no abnormalities, and she repeatedly appeared alert and oriented with normal speech and thought processes. She also behaved appropriately in her interactions with others. Halverson contends the ALJ failed to take into account favorable evidence regarding her credibility, such as her consistent medical treatment over four years and her consistent use of medication. While this evidence is certainly consistent with debilitating symptoms, we cannot say the ALJ's credibility determination was unsupported in light of the objective medical evidence in the record as a whole. Juszczyk, 542 F.3d at 632 (deferring to the ALJ's credibility determination where the objective medical evidence did not support the claimant's testimony as to the depth and severity of his physical impairments).

Based on the ALJ's evaluation of Halverson's daily activities, the objective medical evidence, and other inconsistencies in the record as a whole, we will not disturb the ALJ's decision to discredit, in part, Halverson's subjective complaints.

**C. The ALJ's Rejection of Halverson's Supplemental Evidence**

Finally, we address Halverson's argument the ALJ failed to fully and fairly develop the record by obtaining medical evidence of her work-related limitations. Halverson contends the ALJ should have further developed the record to determine the degree to which her impairments limited her ability to engage in work-related

-16-

activities after the ALJ discredited Dr. Taylor's opinion. Specifically, Halverson suggests the ALJ should have either ordered a consultative evaluation or obtained records related to her private long-term disability insurance benefits she presented at the district court.

"A disability claimant is entitled to a 'full and fair hearing' under the Social Security Act." Hepp v. Astrue, 511, F.3d 798, 804 (8th Cir. 2008). We reject Halverson's claim she was not afforded a full and fair hearing. First, the ALJ's determination is "based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Krogmeier, 294 F.3d at 1024. "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994). In this case, the ALJ considered the medical records, Halverson's statements, and other evidence in making the determination. As described above, there was substantial evidence in the record as a whole to support the ALJ's decision.

Halverson's suggestion regarding her private long-term disability insurance file similarly fails because, although the ALJ is required to fairly and fully develop the record, "he is not obliged to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Mouser, 545 F.3d at 639 (citing Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003)). The claim file proposed by Halverson considered essentially the same information presented to the ALJ. Thus, the additional information would have added nothing to the ALJ's deliberative process. Id. ("Although we have previously faulted the Commissioner for not sufficiently developing the record where the issue was not explicitly raised by the claimant, those cases involved far more evidence indicating that further development was necessary than the facts before us now.").

We conclude there was substantial evidence in the record as a whole to support the ALJ's denial of disability insurance benefits. Accordingly, we affirm the judgment of the district court.

_____