BRIGHT, Circuit Judge,
dissenting.
I would remand this case for rehearing. The administrative law judge (ALJ) omitted a critical legal analysis from his decision and failed to fully and fairly develop the record. Further, in light of a number of inconsistencies in the ALJ’s decision and Robert , Dean Carter’s (Carter) untimely death pending appeal, the ALJ’s residual functional capacity (RFC) assessment is unsupported by substantial evidence. ’ Thus, I respectfully dissent from the majority opinion affirming the denial of disability benefits.
I. BACKGROUND
- In order to understand the ALJ’s errors, I briefly review Carter’s diagnoses and impairments. Physicians diagnosed Carter, at age 31, with an incurable, debilitating disease — congestive heart failure. Most commonly, congestive heart failure is “a chronic disease in which ‘the walls of the heart chambers stretch (dilate) to hold a greater volume of blood than normal.’ ” Snead v. Barnhart, 360 F.3d 834, 837.(8th Cir.2004) (quoting 2 Jacqueline L. Longe, The Gale Encyclopedia of Medicine 896 (2d ed.2002)). As a result, congestive heart failure disrupts the heart’s ability to deliver “oxygenated blood to the body tissues,” causing symptoms such as “easy fatigue, weakness, shortness of breath (dyspnea), .cough, or chest discomfort at rest or with activity.” , 20 C.F.R. pt. 404, subpt. P, App. 1, §§ 4.00D(1)(a), (2)(b)(i). In most cases, congestive heart failure is an “incurable condition” that “worsens over time until death results.” Snead, 360 F.3d at 837. As of 2004, “[o]nly twenty-five percent of patients” like Carter “live[d] for ten years after diagnosis, and men tend[ed] to die from the condition sooner than women.” Id.
Carter’s treating physician, Dr. Jennifer Goerbig-Campbell, M.D. (Dr. Goerbig-Campbell), diagnosed Carter’s congestive heart failure as New York Heart Association (NYHA) Stage C with Class III symptoms.[7] A diagnosis with NYHA Stage C *374 heart failure means “[o]bjective evidence” showed Carter had “[mjarked limitation in activity due to symptoms, even during less-than-ordinary activity” and that Carter was “[c]omfortable only at rest.” Classes of Heart Failure, Am. Heart Ass’n, http://www.heait.org/HEARTORG/ Conditions/HeartFailure/AboutHeart Failure/Classes-of-Heart-Failure_UCM_ 306328_Ajrticle.jsp (last visited Mar. 3, 2016). Carter’s symptoms, at Class III, included “fatigue, palpitation, or dyspnea” during “[l]ess than ordinary activity.” Id.
In addition to Carter’s incurable physical impairments, the administrative record documents Carter’s numerous psychological impairments. Experts diagnosed Carter with anxiety disorder, intermittent explosive disorder, social phobia, antisocial personality disorder, and mood disorder. The ALJ specifically found Carter suffered from “explosive disorder; anxiety disorder; and social phobia.”
II. ANALYSIS
“We review de novo a district court’s denial of social security benefits.” Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir.2010). In our review, “[w]e must ‘determine whether the ALJ’s decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.’ ” Hesseltine v. Colvin, 800 F.3d 461, 464 (8th Cir.2015) (emphasis added) (quoting Halverson, 600 F.3d at 929). Substantial evidence is defined as “ ‘such relevant evidence that a reasonable mind might accept as adequate to support a conclusion.’ ” Halverson, 600 F.3d at 929 (quoting Heino v. Astrue, 578 F.3d 873, 878 (8th Cir.2009)).
A. The ALJ’s Non-Compliance with Relevant Legal Requirements[8]
The ALJ’s decision entitles KKC to a remand because the ALJ improperly omitted any analysis of whether Carter’s impairments “medically equaled” Listing *375 4.02. We have repeatedly held that “[t]he ALJ must determine whether a ‘medical equivalence’ exists between a claimant’s impairment and a listed impairment.” Myers v. Colvin, 721 F.3d 521, 524-25 (8th Cir.2013) (emphasis added) (quoting 20 C.F.R. §§ 404.1526(e), 416.926(e)). In so doing, the ALJ must consider whether the claimant’s impairment, or combination of impairments, are “at least equal in severity and duration to the criteria of any listed impairment.” Id. at 525 (quoting 20 C.F.R. §§ 404.1526(a), 416.926(a)).
Further, we have instructed ALJs to consider the Program Operations Manual System (POMS)[9] guidelines when determining equivalence, even ' though tlie POMS guidelines neither have “legal force” nor “bind the Commissioner.” Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir.2003). In the absence of a substantive analysis by the ALJ regarding medical equivalence, the record is insufficient for an analysis of whether substantial evidence supports the ALJ’s decision. See, e.g., Hesseltine, 800 F.3d at 465-66; Chunn v. Barnhart, 397 F.3d 667, 672 (8th Cir.2005).
Here, the ALJ did not analyze whether Carter’s impairments medically equaled Listing 4.02, nor did the ALJ consider- the POMS guidelines relating to cardiovascular impairments. The ALJ found Carter showed “no évidence of an impairment which ... equalled] the criteria of a listed impairment or [ ] a combination of impairments equivalent in severity ... to a listed impairment.” (Emphasis added). Yet, the ALJ only analyzed the specific requirements of Listing 4.02. Given the failure of the ALJ to “provide the reasons for [the] conclusion” that Carter’s impairment or combination of impairments did not medically equal Listing 4.02, we cannot say whether substantial evidence supported the ALJ’s decision. Hesseltine, 800 F.3d at 466; see also Chunn, 397 F.3d at 672 (“The ALJ failed to support his finding ... Chunn’s impairments did not equal a listed impairment”).
Further, the POMS guidelines directly undermine the ALJ’s decision regarding medical equivalence. The ALJ implied that Carter’s impairments did not medically equal Listing 4.02 because Carter “completed an exercise test in July 2010.” But the POMS guidelines relating to cardiovascular’ impairments spécifically note that, when conducting an “ ‘equals’ analysis,” an ALJ “must not presume [exercise test] results, or any other test results, are entitled to primary or extra weight.” POMS § DI 32594.015(A)(2)(c). Instead, the POMS guidelines aver that an individual with heart failure may “equal” a listing “even where there, is a[n] [exercise test] on file that does not meet the criteria.” Id. § DI 32594.015(A)(3)(e) (emphasis added).
Contrary to the language in the POMS guidelines, the ALJ not only failed to conduct a separate analysis, but also relied almost exclusively on Carter’s exercise test results as determinative that Carter’s “congestive heart failure [was] not of a severity contemplated by [Listing] 4.02B.” In light of the ALJ’s perfunctory analysis, we are unable to evaluate whether substantial evidence supports the ALJ’s finding that Carter’s impairment, or combination of impairments, were not “equal” to Listing 4.02 and remand for reconsideration by the ALJ is necessary.
B. The ALJ’s Failure to Fully and . Fairly Develop the Record
The ALJ’s decision also entitles KKC to a remand because the ALJ failed to fully *376 and fairly develop the record for whether Carter met Listing 4.02 between December 2011 and the November 2012 hearing. “Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant’s burden to press his case.” Snead, 360 F.3d at 838. “The ALJ’s duty to develop the record extends even in cases .,. where an attorney represented the claimant at the administrative hearing.” Id. When developing the record, “[t]he ALJ possesses no interest in denying benefits and must act . neutrally in developing the record.” -Id.
To meet- Listing 4.02, the regulations require, as relevant here, evidence of the following:
A. Medically documented presence of
1. Systolic failure ... with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability....[10]
AND
B. Resulting in one of the following:
1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate; sustain, or complete activities of daily living in an individual for whom an MC ... ‘has concluded that the performance of an exercise test would present a significant risk to the individual; or
2.....
3. Inability to perform on an exercise tolerance test at a workload equivalent to.5 METs or less due [to specified reasons.]
20 C.F.R. pt. 404, subpt. P, App. 1, § 4.02. With regard to Listing 4.02B, the record contains, no evidence regarding Carter’s ability to perform an exercise test at a workload equivalent to more than 5 METs, or whether the performance of an exercise test would have presented a significant risk to Carter, between December 2011 and the November 2012 hearing.
The record includes two exercise tests completed in July 2010 and December 2010 with a V02 max equivalency- of 7.5 METs and 6 METs respectively. The ALJ particularly relied on the July 2010 exercise test as conclusive evidence Carter did not satisfy Listing 4.02B(1) and Listing 4.02B(3) for the entire period. But the July 2010 and December 2010 exercise tests became untimely “12 months after the date they [were] performed.” 20 C.F.R. pt. 404, subpt. P,. App. 1, § 4.00,C(9)(a). After that date, both exercise tests may have provided important information for the ALJ, id,,..§ 4.00C(9)(b), but,- an untimely test could not be treated as conclusive, id., § 4.00C(9)(c).[11] Exer *377 cise tests are not, and should'not be, treated as conclusive evidence after 12 months because congestive heart failure is a progressive disease and patients will, inevitably, get worse over time. See Snead, 360 F.3d at 837.
Here, the ALJ summarily used the July 2010 exercise test to decide Carter did not meet Listing 4.02B(1) and Listing 4.02B(3). The ALJ did so even though the test was untimely after July 2011. 20 C.F.R. pt. 404, subpt. P, App. 1, § 4.00C(9)(a). Further, the ALJ failed to consider the regulations indicating an exercise test will not be purchased if a medical consultant finds a claimant, like Carter, has “[a]n implanted cardiac defibrillator.” Id., § 4,00C(8)(a)(iii).
Because the ALJ should have been aware Carter’s exercise test results were untimely, the ALJ should have taken steps to either: (1) determine whether Carter could complete an exercise. test above 5 METs after December 2011;. or (2) determine whether performance of an exercise test after December 2011 presented a significant risk.to Carter because Carter had an implanted cardiac defibrillator.[12] Carter’s ability to complete an exercise test between December 2011 and the November 2012 hearing was an unexplored, dispositive issue with regard to Carter’s entitlement to disability benefits. In the absence of this information, the only proper result is to remand the case for- further development of the record.
C. The ALJ’s RFC Analysis
Finally, even in the absence of the errors above,- substantial evidence does not support the ALJ’s RFC analysis.
First, the ALJ erred by failing to include in .the hypothetical posed to the vocational expert any reference to the em-ployability. of an individual with, Carter’s physical ailments combined with explosive disorder and social phobia. We have held that “[a] hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ.” Hunt v. Massanari, 250 F.3d 622, ‘625 (8th Cir.2001). But “[t]he hypothetical question must capture the concrete consequences of the claimant’s deficiencies.” Id. (emphasis added). “When a hypothetical question does not encompass all relevant impairments, the vocational expert’s testimony does not constitute substantial evidence.” Id. at 626 (emphasis added).
•Here, the ALJ specifically found Carter suffered from the "severe impairments ... explosive disorder ... and social phobia.” *378 Yet, nowhere in the ALJ’s examination of the vocational expert did the ALJ ask about a hypothetical worker with Carter’s physical ailments combined with explosive disorder and social phobia. In the absence of this examination, the testimony of the vocational expert is. not substantial evidence of Carter’s ability to work in the national economy and further proceedings are needed to determine the effect Carter’s explosive disorder and social phobia had on his employability. See, e.g., Ekeland v. Bowen, 899 F.2d 719, 722 (8th Cir.1990) (“This' court often has held that testimony elicited by hypothetical questions that do not relate with precision all of a claimant’s impairments'cannot constitute substantial evidence”).
Second, to the limited extent the ALJ did ask the vocational expert about a hypothetical worker with Carter’s physical ailments combined with “anxiety” or “mind ... wondering,” the vocational expert opined that the hypothetical worker would be unemployable if the conditions caused the worker to take more than “normal breaks.” But, the ALJ disregarded the vocational expert’s analysis regarding a hypothetical person with Carter’s physical disability as well as “anxiety or “mind ... wondering,” instead relying upon the vocational expert’s, testimony that omitted any analysis of the combination of Carter’s physical ailments and mental impairments. Therefore, in light of the complete absence of the ALJ’s consideration of the combined impact of Carter’s physical ailments and mental impairments, remand for additional proceedings is necessary.
Third, the ALJ’s reliance on a report by Dr. Lawrence Staples (Dr. Staples) to determine Carter had an RFC to do sedentary jobs is unsupported by the ALJ’s findings. While the ALJ “bears the primary responsibility for assessing a claimant’s [RFC] based on all relevant evidence,” Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir.2000), we have noted “a claimant’s [RFC] is a medical question,” Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.2000)). “[S]ome medical evidence” must support the determination of the claimant’s RFC, Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam), and the ALJ should obtain medical evidence that addresses the claimant’s “ability to function in the workplace,” Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000).
Here, the ALJ stated he gave “great weight” to Dr. Staples’ opinion. Yet, the ALJ made multiple determinations inconsistent with Dr. Staples’ report, including:
[[Image here]]
In light of the ALJ’s own .findings, substantial evidence does not support giving “great weight” to Dr. Staples’ opinion in determining Carter’s RFC.
*379 Fourth, in upholding the ALJ’s RFC assessment, the majority relies heavily on the ALJ’s findings that Carter was not disabled because Carter retained an ability to complete many activities of daily living. But we have consistently held that “the ability to do activities such as light housework and visiting with friends provides little if no support for the finding that a claimant can perform full-time competitive work.” Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir.1995); see also Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir.1996) (finding it inappropriate to deny benefits on the grounds that the claimant could make the bed, prepare food, perform light housework, shop for groceries, and visit friends). Accordingly, Carter’s performance of daily activities alone does not support the ALJ’s conclusion that Carter was not entitled to disability benefits.
Finally, when analyzing an individual’s RFC on appeal, I am of the view that this Court should take into account Carter’s untimely death pending appeal of the ALJ’s decision. New material evidence may be grounds for remand. Geigle v. Sullivan, 961 F.2d 1395, 1396 (8th Cir.1992). The materiality inquiry requires determining whether the evidence relates to the time period for which the disability benefits were denied, and whether the evidence “is more than merely cumulative.” Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir.2008). Here, Carter’s death, at age 35, is direct evidence of Carter’s deteriorating condition over the relevant period and, in my view, may directly impact whether the ALJ finds Carter met Listing 4, 02 between December 2011 and the November 2012 hearing.
III. CONCLUSION
Having reviewed many social security disability cases regarding heart failure, a pattern has evolved whereby ALJs deny benefits to individuals because they are capable of “light work” or “sedentary work” — largely relying on the individual’s ability to complete certain activities of daily living. See, e.g., Tomlinson v. Colvin, No. C12-4038-MWB, 2013 WL 1093035 (N.D.Iowa Mar. 15, 2013); Hathman v. Astrue, No. 4:11 CV 1036 TCM, 2012 WL 4324408 (E.D.Mo. Sept. 20, 2012); Brown v. Astrue, No. 4:10 CV 1053 DDN, 2011 WL 4501094 (E.D.Mo. Sept. 28, 2011); Davis v. Astrue, No. 4:09 CV 934 CDP, 2010 WL 3719920 (E.D.Mo. Sept. 13, 2010). Such findings have the unfortunate result of denying benefits to individuals with heart failure unless the evidentiary record shows the individual is totally bedridden. See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir.1999) (“[A] claimant need not be totally bedridden to be disabled”). Denying benefits to individuals simply because they are not bedridden is inconsistent with the purpose of the Social Security Act and I behoove ALJs to consider the impact of forcing individuals with severe heart failure to continue to work. See Butler v. Flemming, 288 F.2d 591, 595 (5th Cir.1961) (“[T]he purpose of much social security legislation is to ameliorate some of these rigors that life imposes. Congress has in effect stated that if a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable ... he shall be deemed to be disabled for the purposes of this Act.”).
For the foregoing reasons, I would remand to the ALJ for a hearing consistent with this dissent. The ALJ has the responsibility to consider the nature of Carter’s impairments, to fully and fairly develop the record, and then to decide whether Carter was entitled to disability benefits.

. The AU gave "weight” to Carter’s diagnosis with NYHA Stage C heart failure with Class III symptoms.

. The majority disregards the AU's non-compliance with the relevant legal requirements, noting KKC failed to fully develop the argument. (Maj. Op. 370 n. 5). But in addition to our substantial evidence analysis, we have a "duty to review the disability benefit decision to determine if it is based on legal enor (i.e., erroneous legal standards, incorrect application of the law).” Nettles v. Schweiker, 714 F.2d 833, 835-36 (8th Cir.1983) (emphasis added); see also Pettit v. Apfel, 218 F.3d 901, 902 (8th Cir.2000) ("When considering whether the ALJ properly denied social security benefits to a claimant, we determine ... whether the ALJ’s decision is based on legal error,”). Further, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of [our Court], to be exercised on the facts of individual cases.” Cf. Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). And it is incumbent upon our Court to consider issues "where the proper resolution is beyond any doubt, or where ‘injustice might otherwise result.’ ” Id. (citation omitted) (quoting Hormel v. Helvering, 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941)); see also Hormel, 312 U.S. at 557-59, 61 S.Ct. 719 (noting that “rules of fundamental justice" require a court to consider issues where "the lower court[ ] failed to give consideration to a phase of the case involving legal theories not presented” and “those in which there have been judicial interpretations of existing law after decision below and pending appeal — interpretations which if applied might have materially altered the result” (footnotes omitted)); cf. Stafford v. Ford Motor Co., 790 F.2d 702, 706-07 (8th Cir.1986) (remanding even when appellant failed to raise the issue in the district court, because the district court only analyzed whether appellant complied with one of two permissible procedures to exhaust internal union appeals). As described above, there is no doubt the ALJ’s legal analysis is deficient and the majority’s failure to reach the issue results in a severe miscarriage of justice for KKC, a minor whose father lost his life at age 35.

. The POMS guidelines are "[¡Instructions for determining whether a person’s combination • of impairments ... medically equal ... a given listing.” Hesseltine, 800 F.3d at 465.

. As the majority holds, and the record evidence proves, Carter had systolic failure with an ejection fraction of 30 percent or less during a period of stability. In fact, repeated objective tests showed Carter had an ejection fraction between 20 percent and 9.1 percent during .the relevant period. In spite of the undisputed evidence that Carter had a severe ejection fraction, the ALJ minimized the medical record stating Carter "may have an ejection fraction of , 30 percent or less.” This finding by the ALJ improperly minimized Carter’s documented physical impairment and suggests the ALJ did not, in fact, clearly understand Carter's physical impairment.

. The-majority concedes the July 20.10 and December 2010 exercise tests were untimely 12 months after the date on which the tests were performed. (Maj. Op. 370-71 n. 6). But the majority dismisses this gap in the evidentiary record, opining "the ALJ fairly concluded that the evidence before him was sufficient to determine that Carter was not disabled” for the entire relevant period. {Id. (citing 20 C.F.R. pt. 404, subpt. P, App. 1, § 4.00C(9)(d))). But, contrary to the majority’s assertion, the ALJ could not "make a determination or decision based on the evidence” in the record, §-4.00C(9)(d), because *377 of the complete absence of evidence regarding whether Carter could perform an exercise test at 5 METs or less between December 2011 and November 2012. See id., § 4.00C(9)(a) (noting a test is only timely for 12 months); see also Snead, 360 F.3d at 838 (“Well-settled precedent confirms that .the AU bears a responsibility to develop the record fairly and fully, independent of the claimant’s burden to press his case.’’).

. The majority asserts “[t]he record also is devoid of any evidence that a medical consultant had concluded that an exercise test would have presented a significant risk.” (Maj. Op. 370-71 n. 6). But Carter-presented .significant evidence that Carter had “[a]n implanted cardiac defibrillator” which, by definition, means an exercise test presented a “significant risk” to Carter. 20 C.F.R. pt. 404, subpt. P, App. 1, § 4.00C(8)(a)(iii). Further/ the ALJ had an independent duty to determine whether a test after December 2011 would have presented a significant risk to Carter, because there is no evidence in the record to support the position that it was safe to perform an exercise test. See Snead, 360 F.3d at 838 ("[T]he ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant’s burden to press his case.”).