ERICKSON, Circuit Judge, dissenting.
The parent of a disabled child who goes to any length to support and assist the child in ways that allow the child to be as fully integrated in society as possible rejoices in the child's success. That same parent worries about what will happen to the child after he or she is gone, fearful that the system will fail the child and leave him or her mostly defenseless in a world that little recognizes mental illness and the hurdles it lays before those who suffer. This case is a case in which those parental fears have been realized. And I respectfully dissent.
Robert Dols faces many significant mental health challenges. He is 62 years old and suffers from, among other things, depression, anxiety, alcohol dependence, and autism-spectrum disorder. His intellectual functioning falls in the low-average range, but his memory is not as good as one would expect of a person with his IQ. As a result of his mental health issues, Robert struggles to interact appropriately with others. He is easily frustrated and engages in conduct that is generally considered by others to be unusual and avoidant. He lacks sufficient insight to see most, if any, of these limitations in himself. The record reflects that, while in conversation with others, Robert scowls, grunts, squeals, avoids eye contact, is unable to track the conversation, and is unable to appropriately answer questions put to him. Robert sometimes shouts out vulgarities or makes odd guttural noises when anxious, particularly in group settings. Robert reports that he is sometimes asked to leave a job after a single day. No one has been able to identify that Robert has ever had a close friend. Robert lived with his parents until *750 he was nearly fifty years old-only becoming independent when his mother was placed in a nursing home.
While living at home with both of his parents, Robert was able to maintain sustained full-time employment with the assistance and support of his parents. When his father died in 2004, Robert quit his job to assist his mother. In 2006, Robert's mother was placed in a nursing home, and he moved into an apartment. Since then, Robert has been unable to hold a job, has suffered from alcoholism, and was homeless for a time. He now lives in an alcohol-related group home, even though he no longer meets the requirements to reside there.
I recognize that some conflict exists in the record as to the nature and extent of Robert's social limitations. But, because the ALJ failed to provide "good reasons" for rejecting Robert's primary counselor's opinion, I would reverse and remand to the district court with instructions to remand to the ALJ for reconsideration of Robert's application after giving the counselor's opinion proper weight.
The ALJ assigned "great weight" to the opinion of Dr. Lace, who conducted a review of the record and testified as a consulting physician. The ALJ, however, gave "no weight" to the opinion of Robert's "primary counselor" in the intensive outpatient program, Nancy Kaley. The ALJ found Kaley's testimony about the "intensity, persistence and limiting effects of [Robert's] symptoms" to be "not credible" because of the inconsistency with (1) Dr. Lace's opinion, (2) "observations by medical providers," and (3) Robert's activities of daily living (ADLs). The record does not support the ALJ's credibility assessment.
In assessing whether a claimant is disabled for the purposes of Social Security benefits eligibility, an ALJ must consider evidence provided by "other sources" like Kaley. Lawson v. Colvin, 807 F.3d 962, 967 (8th Cir. 2015). When an ALJ discounts evidence based on a perceived lack of credibility, "[w]e 'do not reweigh the evidence presented to the ALJ' " but rather defer to the ALJ's credibility determinations "as long as those determinations are supported by good reasons and substantial evidence." Midgyett v. Comm'r, Soc. Sec. Admin., 727 F. App'x 228, 229 (8th Cir. 2018) (quoting Johnson v. Colvin, 788 F.3d 870, 872 (8th Cir. 2015) ). Kaley's opinion is neither inconsistent with medical provider observations nor Robert's ADLs.
Kaley testified that Robert does not know how to interact with or relate to others and needs help to communicate with others. She testified that he gets "agitated and nervous" when required to interact with others, "does not respond appropriately to conversation," and "does everything by himself." She described "his pattern of relating to others" to include angry facial expressions, avoidance of eye contact, sudden profane outbursts, tics, grunts and roars, and an inability to understand humor. Kaley identified these behaviors as the primary obstacle to Robert's employment. She found notable "deficits in terms of fending for himself." Kaley opined that Robert "wouldn't make it [living by himself]" because "he doesn't know how to interact with people. He can't hold a job, he can't." She testified that he would be homeless if he did not reside in a supportive environment.
Consistent with Kaley's testimony, Dr. Lace testified that Robert's "anxiety and Asperger's symptoms" would allow only "very brief and very superficial and very infrequent contact with supervisors and coworkers" and zero contact with the public. "[H]e would work best on his own with ... very limited contact with other people except for supervisors." Dr. Lace further testified that an adaptive skills test measured *751 Robert's socialization to be "very low" and worse than a random sampling of 100,000 people, his adaptive behavior to be unexpected for someone of average intelligence, and his communication to be only better than one out of 10,000 randomly selected people.
"[T]he opinions of non-examining, consulting physicians" by themselves are not "substantial evidence." Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004). Instead, the Social Security Administration directs an ALJ to consider the same set of factors for weighing a non-medical opinion like that of Kaley as a medical opinion like that of Dr. Lace. See 20 C.F.R. § 404.1527(c), (f)(1). An ALJ is to consider: (1) the type of relationship between the source and the claimant, (2) the length of relationship, (3) the frequency of examination, (4) the nature and extent of the relationship, (5) the opinion's supportability with objective medical evidence, (6) the opinion's consistency with the record, (7) the source's area of specialty, and (8) "anyfactors ... which tend to support or contradict the medical opinion." Id. § 404.1527(c). An ALJ must consider "all" of these factors. See id. The Administration acknowledges that factors such as seeing the claimant more often or providing better supporting evidence or a better explanation may lead to the conclusion that a non-medical opinion outweighs a medical opinion-and even an opinion from a treating source. See id. § 404.1527(f)(1).
The ALJ relied on two of these factors to weigh the opinions of Kaley and Dr. Lace-consistency with the record and their respective areas of speciality. Of course, one opinion may be credited over another when supported by better or more thorough evidence. See Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007). But, the evidence cited in support of Dr. Lace's opinion-his "expertise in mental health, familiarity with the disability review process and his ability to review all of the evidence"-is not better. Other factors such as the length, nature, and extent of Robert's relationship with Kaley are particularly relevant here-none of which was addressed in the ALJ's decision. Kaley worked with Robert as his primary counselor for three and a half years. Her testimony reveals a high degree of familiarity with Robert. She knows his daily habits, routines, and quirks. She knows how he interacts with others because she routinely observes him in social settings like the common area and group therapy sessions. She described his specific behavior and its consequences in a variety of social settings.
The ALJ acknowledged that Dr. Lace could not provide "the kinds of conclusions that you could reach only if you were a treating source" and that the scope of Dr. Lace's testimony was limited because he never examined or treated Robert. Even so, the ALJ gave Kaley's testimony no weight. The Administration recognizes the importance of opinions from those most familiar with the claimant-a reason controlling weight is generally given to medical opinions from treating sources. They tend to be the ones "most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)" and to provide a "unique perspective" of the record otherwise unavailable from "objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 404.1527(c)(2). Although Kaley may not be a medical source, her unique relationship with Robert provides a detailed, longitudinal picture of his daily social functioning that is unavailable from the record evidence.
The ALJ pointed to "[c]linical observations" as support for Robert's ability to "perform full-time work within the mental *752 parameters of the [RFC]." But, those observations are inconsistent. During a phone call with an administration employee, Robert demonstrated an ability to understand, concentrate, speak coherently, and answer questions. At an in-person appointment, however, he demonstrated poor communication and eye contact, lack of social relationships, and a vocal tic while meeting with a psychologist. Although the resolution of "conflicting evidence is within the province of the ALJ," Brachtel v. Apfel, 132 F.3d 417, 420 (8th Cir. 1997), an ALJ may not discount opinions from "other sources" like Kaley just because the evidence is mixed, see 20 C.F.R. § 404.1527(f)(1).
A review of the record reveals that Kaley's opinion is not inconsistent with the observations as a whole. She testified that part of what impedes Robert's full-time employment is the volatility of his social reactions. She testified that his triggers are hard to predict. She described instances when his behavior has "escalated" in response to "certain personalit[ies]," new environments or people, or disruptions in his routine. During times when he is agitated and nervous, Robert shouts more and rolls his fingers more.
By focusing on observations of Robert's affect, the ALJ discounted objective medical evidence produced during the visits. For example, the ALJ noted Robert's "cooperative and polite" affect at a 2013 evaluation, but the evaluation opined that Robert's employment prospects were, at best, "marginal ... in positions that do not place much emphasis on social maturity and sustained interactions with others."
With regard to Robert's ADLs, we have "repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (internal quotation marks omitted) (quoting Reed v. Barnhart, 399 F.3d 917, 923-24 (8th Cir. 2005) ). And even if conflicting ADLs are sometimes a good reason to discount testimony, Robert's ADLs do not conflict with Kaley's opinion. The ALJ indicated that, despite Robert's reported "problems with social interactions," he takes baths, gets dressed, does chores, reads magazines, prepares meals, rides his bike, goes to movies, goes shopping, attends mandatory weekly meetings, and arranged a ride to a medical appointment on at least one occasion. Kaley testified that these activities are infrequent. Robert attended one movie by himself over the course of approximately two years. That Robert occasionally engages in solitary activities-or even a one-time conversation to arrange a ride-does not establish that he has the social skills necessary to maintain full-time employment. In fact, there is substantial evidence in the record to the contrary.
Similar to the clinical observations, Robert's ADLs also paint a mixed picture of his abilities. For example, after Robert arranged the ride, he exhibited behavior at the appointment that aligns with Kaley's testimony. "He was frowning/scowling the entire appointment" and "related in a rather odd manner." He talked "to himself under his breath, he had a grunting type vocal tic and he presented as if he was agitated."
Finally, the ALJ's conclusion that Kaley's opinion was not substantiated by "other evidence" is not supported by the record. Robert's employment history clearly shows his inability to maintain full-time work without support. He has held two full-time jobs in his 62 years of life-one for eight years and one for seven-both exclusively while he lived at home with his parents. Even though Robert voluntarily *753 quit a part-time janitorial job sometime shortly before the hearing, that job is hardly evidence of Robert's ability to maintain full-time employment in a competitive environment. He worked "maybe twice a month, once every two weeks, and on a part time basis making $8 an hour." Without the support and assistance of his parents, Robert has been unable to maintain a full-time job.
In closing, I fear the majority's decision reflects an increasing tendency to "rubber stamp" an ALJ's action in contravention of the "scrutinizing analysis" our precedent requires. See Cline v. Colvin, 771 F.3d 1098, 1106 (8th Cir. 2014) (Bright, J., dissenting); Cooper v. Sec'y of Health & Human Servs., 919 F.2d 1317, 1320 (8th Cir. 1990). The ALJ's rejection of Kaley's testimony was error when viewed in light of the record as a whole. I believe the ALJ failed to provide "good reasons" for rejecting Kaley's testimony, and that error is not harmless. I would reverse and remand to the district court with instructions to remand to the ALJ for reconsideration of Robert's claim after giving Kaley's opinion proper weight.