# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-1030
_____

KKC, through her mother and custodial parent Nikki Stoner

*Plaintiff - Appellant*

Robert Dean Carter

*Plaintiff*

v.

Carolyn W. Colvin, Acting Commissioner of Social Security

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines
_____

Submitted: September 24, 2015
Filed: March 17, 2016
_____

Before WOLLMAN, BRIGHT, and COLLOTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Robert Dean Carter applied for disability insurance benefits and supplemental security income under the Social Security Act. An administrative law judge (ALJ)

denied his application, concluding that Carter was not disabled because he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments and because Carter had the residual functional capacity (RFC) to perform a limited range of sedentary work. The Appeals Council denied Carter's request for review. Carter later died, and his daughter, KKC, sought judicial review of the denial of disability insurance benefits. KKC now appeals the district court's[1] judgment affirming the denial of benefits. We affirm.

## I. Background

Carter was born on July 21, 1978. He had an eleventh-grade education and had past relevant work experience as a waiter, a cook, an electrician helper, a fast-food manager, and a fast-food worker. Carter had been a heavy smoker, but after being diagnosed with congestive heart failure, he reduced the number of cigarettes he smoked from two or three packs per day to approximately ten cigarettes per day.

Carter applied for disability insurance benefits and supplemental security income on March 18, 2011, alleging a disability onset date of July 15, 2009. Carter stopped working on May 2, 2010. He claimed that heart failure and reliance on a defibrillator rendered him disabled. According to function reports completed by Carter and his fiancée in August 2010, Carter was able to prepare meals, play with their children, wash clothes and dishes, drive, play video games and cards, watch television, and visit friends. Carter and his fiancée also stated that Carter became exhausted easily and could not stand for more than half an hour at a time.

---

[1]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

## A. Heart Failure

On July 29, 2009, Carter was admitted to the hospital because of shortness of breath after minimal exertion. He was discharged a week later, having been diagnosed with chest pain, dilated cardiomyopathy, congestive heart failure, mitral regurgitation, nonsustained ventricular tachycardia, and hypertension. Carter's left ventricular ejection fraction (EF) was twenty percent. Carter eventually resumed working full time at a fast-food restaurant.

On May 3, 2010, Carter was admitted to the Iowa Heart Center Hospital because of chest pain, fatigue, and shortness of breath. His EF had dropped to ten percent. The attending physician referred Carter to the University of Iowa's heart transplant program, but advised that Carter would not be eligible for a heart transplant unless he quit smoking and underwent psychiatric evaluation. Carter had a defibrillator implanted on May 6, 2010, and was discharged the next day. Carter did not return to work after his hospitalization.

On May 26, 2010, Jennifer Goerbig-Campbell, M.D., of the University of Iowa Heart and Vascular Center, began treating Carter and evaluating his candidacy for advanced heart failure therapies. Carter reported a gradual decline in his physical capacity since his July 2009 diagnosis. He stated that he had stopped working because he could not stand for more than two hours a day. Carter explained that he could walk three blocks, but that he became lightheaded and short of breath when engaged in household activities like cooking, washing dishes, or picking up toys. He also reported that he had trouble sleeping and in controlling his anger. Dr. Goerbig-Campbell diagnosed Carter with nonischemic cardiomyopathy. She believed that Carter's heart failure was advanced, but explained that he would have to quit smoking and seek mental health treatment to be considered for advanced heart failure therapies. She also advised Carter to seek dental care. Dr. Goerbig-Campbell eventually

classified Carter as having stage C, New York Heart Association (NYHA) class III symptoms.

Carter returned to the University of Iowa for monthly appointments with Dr. Goerbig-Campbell and her staff. He reported that he was able to walk short distances, complete light housework, and care for his children, with some fatigue. Carter was deferred from advanced cardiac therapies in September 2010, however, because he had not quit smoking, established mental health care, obtained dental care, or scheduled a sleep study, despite repeated instructions to do those things. Carter thereafter missed several appointments. When he returned for appointments in December 2010 and January 2011, Carter complained of fatigue. The medical record from his May 2, 2011, appointment indicates that "[t]he most activity [Carter] has done in the past couple months is walk a friend's dog that weighs 40 pounds a block. He does feel tired after that, but no shortness of breath. He has 3 children ages 5, 6, and 12 who he is active with and also helps with school."

## B. Psychiatric Background

In September 2010, Carter met with a psychiatrist, who characterized Carter's anger management problems as intermittent explosive disorder. Carter initiated mental health treatment with a local provider in April 2011 and regularly attended counseling sessions through June 2011. Progress notes from the counseling sessions indicate that Carter had intact insight and judgment, good memory and eye contact, and appropriate impulse control. In late April, he was diagnosed with generalized anxiety disorder, social phobia, and mood disorder. He was prescribed psychiatric medications, and he reported at his follow-up appointment that he was "not worrying as much, sleeping better, having increased patience, and decreased irritability." He had passed a GED pre-test and helped a neighbor fix her bike. After his June 2011 appointment, Carter did not return for treatment until late October 2012, when he reported feeling angry and not sleeping well. His medication was then adjusted.

## C. Psychiatric and Medical Evaluations

On November 2, 2010, Carter met with Richard Martin, Ph.D., who conducted a psychiatric examination upon referral by Iowa Disability Determination Services. According to Dr. Martin, Carter "showed generally adequate effort and motivation throughout," but "focused on portraying himself as having extreme anger problems, and appeared prone to exaggerate his claimed problems." Carter reported being able to drive, prepare simple meals, and complete all self-care tasks independently. Dr. Martin opined that Carter met some of the criteria of intermittent explosive disorder and that he might have difficulty maintaining concentration, but that Carter had sufficient intellectual abilities to handle a wide range of unskilled work. Philip Laughlin, Ph.D., completed a psychiatric review technique form on December 13, 2010, and found that Carter did not suffer from any severe mental impairment. Russell Lark, Ph.D., completed a mental RFC assessment on June 14, 2011, finding that Carter had some moderate limitations, but that Carter was "able to complete simple, repetitive to moderately complex tasks on a sustained basis." Dr. Lark concluded that Carter suffered from generalized anxiety disorder, social phobia, and intermittent explosive disorder.

Lawrence Staples, M.D., completed a physical RFC assessment on December 15, 2010. He opined that Carter could lift up to ten pounds, that he could stand for two hours and sit for six hours in an eight-hour workday, and that he had certain postural and environmental limitations. Dr. Staples gave controlling weight to Dr. Goerbig-Campbell's opinion that Carter's "impairment is in Stage C, NYHA functional class 3 heart failure." Matthew Byrnes, D.O., completed a physical RFC assessment on May 18, 2011. Dr. Byrnes concluded that Carter could lift or carry ten pounds occasionally and less than ten pounds frequently, that he could stand for at least two hours and sit for at least six hours in an eight-hour workday, and that he had certain postural and environmental limitations.

## D. Social Security Proceedings

Carter's claim for disability insurance benefits and supplemental security income was denied initially and on reconsideration. At Carter's request, a hearing was held before an ALJ on October 10, 2012. Carter testified that he could not stay at his fast-food job due to the required standing and that he could not do a job that involved sitting due to anxiety. A vocational expert also testified. The ALJ asked the vocational expert to consider a hypothetical individual who could perform sedentary work[2] that required no climbing and occasional stooping, crouching, kneeling, and crawling. Further, the individual had to work in a climate-controlled, indoor environment. Finally, the individual could perform simple routine, repetitive work that did not require close attention to detail, the use of independent judgment, or contact with the general public. The vocational expert testified that such an individual could perform the representative sedentary unskilled jobs of bench assembler, addresser, and order clerk.

The administrative record included Carter's medical and psychiatric records, medical and psychiatric evaluations, and function reports by Carter and his fiancée. It also included a letter dated September 23, 2010, from Dr. Goerbig-Campbell indicating her support for Carter's request for disability benefits. The ALJ allowed Carter to supplement the record after the hearing. Carter submitted a letter, wherein his attorney had asked Dr. Goerbig-Campbell to indicate her agreement with the statement, "[Y]ou have explicitly ordered [Carter] to refrain from any work, including sedentary work, as well as any other activities, since any slight physical exertion or

---

[2]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

mental stress could affect the precarious condition of Mr. Carter's heart." Dr. Goerbig-Campbell declined to agree with the statement, noting instead that Carter's heart failure was severe but that she could not attest to his condition after May 2011, when he was last treated by providers at the University of Iowa Heart and Vascular Center.

The ALJ's November 29, 2012, opinion described the five-step sequential evaluation process that he conducted in determining whether Carter was disabled.[3] The ALJ found that Carter met the first two steps of the analysis: he had not engaged in substantial gainful activity since April 1, 2010, and his impairments—heart failure, explosive disorder, anxiety disorder, and social phobia—were severe. At step three, the ALJ determined that Carter did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Accordingly, the ALJ proceeded to the fourth step and found that Carter could not return to his past relevant work. The ALJ determined, however, that Carter maintained the RFC to perform sedentary work with certain limitations.[4] At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Carter could perform. The ALJ thus denied Carter's application for disability insurance benefits and supplemental security

---

[3]The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. § 404.1520(a)(4).

[4]The ALJ set forth the following limitations on Carter's sedentary work: only occasionally could Carter stoop, crouch, kneel or crawl; he could never climb ladders, ropes, or scaffolds; he could work only in a climate-controlled, indoor environment; he was limited to simple, routine, repetitive work that did not require close attention to detail or use of independent judgment; he could not be required to complete tasks that involved contact with the public.

income. The Appeals Council denied Carter's request for review, making the ALJ's decision the final decision of the Commissioner.

Carter died of end-stage cardiomyopathy on May 2, 2014, following which KKC continued the appeal from the denial of disability insurance benefits. The district court affirmed, concluding that substantial evidence on the record as a whole supported the ALJ's determination that Carter was not disabled.

## II. Discussion

We review *de novo* a district court's decision to uphold the denial of social security benefits. Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir. 2015). Our review of the Commissioner's decision is deferential, and we will affirm "if it is supported by substantial evidence on the record as a whole." Id. (internal quotation marks and citation omitted). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). While we take into account evidence that detracts from the decision, we will not reverse merely "because substantial evidence also exists in the record that would have supported a contrary outcome, or because we would have decided the case differently." Andrews, 791 F.3d at 928 (internal quotation marks and citation omitted).

## A. Listing 4.02

KKC argues that the ALJ committed an error at step three of the sequential analysis by finding that Carter did not meet or equal the criteria of the chronic heart failure listing. To qualify for disability benefits at step three, a claimant must establish that his impairment meets or equals a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). An impairment meets a listing only if it "meet[s] *all* of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). "An

impairment that manifests only some of those criteria, no matter how severely, does not qualify." Id. To prove that an impairment or combination of impairments equals a listing, a claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Id. at 531.

KKC argues that Carter's impairment met the listing for chronic heart failure, Listing 4.02, which has two parts: A and B.[5] Listing 4.02 provides that "[t]he required level of severity for [chronic heart failure] is met when the requirements in *both A and B* are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02. It is undisputed that Carter met the requirement in part A, which demands medically documented evidence of systolic failure with ejection fraction of thirty percent or less during a period of stability. See id. § 4.02(A). The ALJ determined, however, that Carter's impairment did not satisfy part B. KKC argues that the ALJ erred in finding that Carter's impairment did not meet the criteria in part B(1) or part B(3).

Substantial evidence supports the ALJ's finding that Carter's impairment did not meet section 4.02(B)(1), which requires a claimant to establish the following:

> Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom [a medical consultant], preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual[.]

KKC cites evidence that Carter was limited in his ability to perform activities of daily living, but the record likewise includes evidence that Carter was able to complete such activities. Carter was able to drive, shop for groceries, and play video games and

---

[5]KKC has argued that Carter's impairment met Listing 4.02. She has made no separate, substantive argument that his impairment or combination of impairments medically equaled Listing 4.02 or any other listing.

cards. He could take care of himself, look after his children, and help care for pets. Although housework caused Carter to become fatigued, he was able to prepare simple meals, vacuum, wash dishes, do laundry, take out the trash, and pick up toys. The record also is devoid of any evidence that a medical consultant had concluded that an exercise test would have presented a significant risk to Carter.

Substantial evidence also supports the ALJ's finding that Carter did not meet section 4.02(B)(3), which requires a claimant to establish an "[i]nability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less." Carter underwent two exercise tests. The results from the July 7, 2010, test indicated a VO2 max per kilogram of 26.3, which is equivalent to 7.5 METs. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(C)(5). The results from the December 13, 2010, test reflected a VO2 max per kilogram of 21, which is equivalent to 6 METs.[6] Id. Accordingly, Carter did not satisfy the criteria set forth in section 4.02(B), and his impairment did not meet Listing 4.02. See Zebley, 493 U.S. at 530.

_____

[6]Both exercise tests were performed during his alleged period of disability and after his defibrillator was implanted. Neither indicated a workload equivalent to 5 METs or less. The results from those tests were timely for twelve months after the date on which the tests were performed. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00C(9)(a).

KKC argues that the record should have included results from a more recent test. She theorizes that the ALJ did not order an additional exercise test because the Social Security regulations forbid purchasing an exercise test for a claimant, like Carter, who has an implanted cardiac defibrillator. See id. § 4.00C(8)(a)(3). The regulations, however, do not necessarily require recent test results to be part of the record: An exercise test will not be purchased if a determination can be made based on the evidence in the record, see id. § 4.00C(9)(d), and the ALJ fairly concluded that the evidence before him was sufficient to determine that Carter was not disabled.

## B. Treating Physician

KKC argues that the ALJ erred by refusing to give controlling weight to the opinion of Carter's treating physician. A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." 20 C.F.R. § 404.1527(d)(2); see also SSR 96-2p, 1996 WL 374188, at *2 (Social Security Administration, July 2, 1996). According to KKC, Dr. Goerbig-Campbell's letter in support of Carter's application for disability benefits, together with her diagnosis that Carter had stage C, NYHA class III heart failure, compel a finding Carter was disabled. We disagree.

In her September 2010 letter, Dr. Goerbig-Campbell expressed her support of Carter's application for disability benefits and stated that Carter "ha[d] significant physical limitations due to symptoms of lightheadedness, fatigue, decreased exercise tolerance, shortness of breath and muscle aches." The ALJ acknowledged the letter, but declined to give it controlling weight because (1) the question whether Carter was disabled constituted a legal determination reserved for the Commissioner, (2) the letter did not set forth Carter's functional limitations, and (3) Carter's medical treatment records indicated that he was able to complete activities consistent with limited sedentary work.

We conclude that the ALJ did not err in according limited weight to the letter. Dr. Goerbig-Campbell's statement that she supported Carter's benefits application did not resolve the legal issue whether Carter was disabled under the Social Security Act. See Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant cannot be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal quotation marks and citation omitted)); 20 C.F.R.

§ 404.1527(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Moreover, the ALJ considered Dr. Goerbig-Campbell's opinion that Carter had significant physical limitations, but found it to be unhelpful in determining Carter's RFC because Dr. Goerbig-Campbell had not identified specific functional limitations. Instead, Carter's medical records were instructive because they referred to specific activities that Carter could and could not complete.

KKC next argues that Dr. Goerbig-Campbell's diagnosis of Carter as having stage C, NYHA class III supports a finding that Carter was disabled. Stage C heart failure means that the patient has structural heart disease and has had symptoms of heart failure. Heart Failure Stages & Functional Classifications, Emory Healthcare, emoryhealthcare.org/heart-failure/learn-about-heart-failure/stages-classification.html (last visited Mar. 14, 2016). Class III indicates that the patient has marked limitation of physical activity and is comfortable at rest, with less than ordinary activity causing symptoms. Id. Although a classification of stage C, NYHA class III heart failure could support a finding of disability, Carter's classification did not require the ALJ to make such a finding in this case. The ALJ gave weight to Dr. Staples's opinion that, even with such a classification, Carter maintained the RFC to perform some work. The ALJ fairly determined that sedentary work with certain limitations was consistent with Carter's classification, his medical records, and the function reports written by Carter and his fiancée.

KKC argues that the record is, at a minimum, unclear whether Carter was disabled. She contends that the ALJ should have sought further information from Dr. Goerbig-Campbell regarding Carter's functional limitations, or ordered a consultative examination. Although an ALJ has a responsibility to "neutrally develop the facts," he does not "have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Stormo, 377 F.3d at 806 (citing Snead v.

Barnhart, 360 F.3d 834, 838-39 (8th Cir. 2004)).  Carter's medical records, function reports, and testimony indicated that he had the RFC to perform limited sedentary work.  Moreover, the ALJ accepted the supplemental information from Dr. Goerbig-Campbell that Carter submitted after the hearing.  That information did not list and substantiate specific functional limitations, however, nor did Dr. Goerbig-Campbell agree with the statement that she had ordered Carter "to refrain from any work, including sedentary work."  The ALJ did not have a duty to seek additional information from Dr. Goerbig-Campbell, nor was he required to order an additional consultative examination.  See 20 C.F.R. § 404.1519a(b) (stating that a consultative examination may be purchased when the evidence as a whole is insufficient to support a decision on the claimant's claim).

## C.  Residual Functional Capacity

KKC argues that the ALJ improperly substituted his own opinion about the medical evidence in determining Carter's RFC.  We disagree, for the ALJ properly applied the medical evidence in the record to determine Carter's ability to function in the workplace.  See Stormo, 377 F.3d at 807 ("The ALJ is responsible for determining a claimant's RFC, a determination that must be based on medical evidence that addresses the claimant's ability to function in the workplace.").

In determining Carter's RFC, the ALJ considered the evidence in the record.  The ALJ recounted Carter's medical history and found that Carter had reported being able to complete activities consistent with limited sedentary work.  During his first appointment with Dr. Goerbig-Campbell, for example, Carter reported that he could not stand for more than two hours a day.  Accordingly, the ALJ limited Carter to sedentary jobs.  Carter consistently had reported that he was able to walk some and complete household chores, albeit with fatigue.  The ALJ thus limited Carter to jobs with a similar level of exertion and posturing as the activities of daily living that he

-13-

was able to complete. The ALJ also considered Carter's diagnosis of stage C, NYHA class III heart failure, finding that although that diagnosis indicated symptoms of heart failure with less-than-ordinary exertion, "sedentary work would eliminate most occasion for exertion on the part of the claimant."

The ALJ found that the activities listed in Carter's function report indicated that Carter had "some minimal ability to be on his feet [and] also use his hands to complete objectives while sitting." The ALJ noted that, after completing the function report, Carter had "received little more treatment for his heart condition." The ALJ interpreted this minimal treatment and the gap in treatment from May 2011 until the time of the hearing as indicating that Carter's condition had remained stable.

Moreover, Carter testified that the reason he could not perform a sit-down job was because of anxiety—not because of physical exertion. The ALJ found that Carter's contention that the stress resulting from a sit-down job would further affect his heart was undermined by his work history, his infrequent treatment for mental health, and the results of his psychological consultative examination. The ALJ accounted for Carter's mental impairments by limiting Carter to jobs that did not require him to have contact with the public and that involved simple, routine, repetitive work that did not require close attention to detail or use of independent judgment.

We conclude that the ALJ's RFC assessment was supported by substantial evidence on the record as a whole.

III. Conclusion

The judgment is affirmed.

BRIGHT, Circuit Judge, dissenting.

I would remand this case for rehearing. The administrative law judge (ALJ) omitted a critical legal analysis from his decision and failed to fully and fairly develop the record. Further, in light of a number of inconsistencies in the ALJ's decision and Robert Dean Carter's (Carter) untimely death pending appeal, the ALJ's residual functional capacity (RFC) assessment is unsupported by substantial evidence. Thus, I respectfully dissent from the majority opinion affirming the denial of disability benefits.

## I. BACKGROUND

In order to understand the ALJ's errors, I briefly review Carter's diagnoses and impairments. Physicians diagnosed Carter, at age 31, with an incurable, debilitating disease—congestive heart failure. Most commonly, congestive heart failure is "a chronic disease in which 'the walls of the heart chambers stretch (dilate) to hold a greater volume of blood than normal.' " Snead v. Barnhart, 360 F.3d 834, 837 (8th Cir. 2004) (quoting 2 Jacqueline L. Longe, The Gale Encyclopedia of Medicine 896 (2d ed. 2002)). As a result, congestive heart failure disrupts the heart's ability to deliver "oxygenated blood to the body tissues," causing symptoms such as "easy fatigue, weakness, shortness of breath (dyspnea), cough, or chest discomfort at rest or with activity." 20 C.F.R. pt. 404, subpt. P, App. 1, §§ 4.00D(1)(a), (2)(b)(i). In most cases, congestive heart failure is an "incurable condition" that "worsens over time until death results." Snead, 360 F.3d at 837. As of 2004, "[o]nly twenty-five percent of patients" like Carter "live[d] for ten years after diagnosis, and men tend[ed] to die from the condition sooner than women." Id.

Carter's treating physician, Dr. Jennifer Goerbig-Campbell, M.D. (Dr. Goerbig-Campbell), diagnosed Carter's congestive heart failure as New York Heart

-15-

Association (NYHA) Stage C with Class III symptoms.[7]  A diagnosis with NYHA Stage C heart failure means "[o]bjective evidence" showed Carter had "[m]arked limitation in activity due to symptoms, even during less-than-ordinary activity" and that Carter was "[c]omfortable only at rest."  Classes of Heart Failure, Am. Heart Ass'n,  http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeart Failure/Classes-of-Heart-Failure_UCM_306328_Article.jsp (last visited Mar. 3, 2016).  Carter's symptoms, at Class III, included "fatigue, palpitation, or dyspnea" during "[l]ess than ordinary activity."  Id.

In addition to Carter's incurable physical impairments, the administrative record documents Carter's numerous psychological impairments.  Experts diagnosed Carter with anxiety disorder, intermittent explosive disorder, social phobia, antisocial personality disorder, and mood disorder.  The ALJ specifically found Carter suffered from "explosive disorder; anxiety disorder; and social phobia."

## II.  ANALYSIS

"We review de novo a district court's denial of social security benefits." Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010).  In our review, "[w]e must 'determine whether the ALJ's decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.' " Hesseltine v. Colvin, 800 F.3d 461, 464 (8th Cir. 2015) (emphasis added) (quoting Halverson, 600 F.3d at 929).  Substantial evidence is defined as " 'such relevant evidence that a reasonable mind might accept as adequate to support a conclusion.' " Halverson, 600 F.3d at 929 (quoting Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009)).

_____

[7]The ALJ gave "weight" to Carter's diagnosis with NYHA Stage C heart failure with Class III symptoms.

## A.    The ALJ's Non-Compliance with Relevant Legal Requirements[8]

The ALJ's decision entitles KKC to a remand because the ALJ improperly omitted any analysis of whether Carter's impairments "medically equaled" Listing 4.02. We have repeatedly held that "[t]he ALJ <u>must</u> determine whether a 'medical equivalence' exists between a claimant's impairment and a listed impairment." <u>Myers v. Colvin</u>, 721 F.3d 521, 524-25 (8th Cir. 2013) (emphasis added) (quoting 20 C.F.R. §§ 404.1526(e), 416.926(e)). In so doing, the ALJ must consider whether the

---

[8]The majority disregards the ALJ's non-compliance with the relevant legal requirements, noting KKC failed to fully develop the argument. (Maj. Op. 9 n.5). But in addition to our substantial evidence analysis, we have a "<u>duty</u> to review the disability benefit decision <u>to determine if it is based on legal error</u> (i.e., erroneous legal standards, incorrect application of the law)." <u>Nettles v. Schweiker</u>, 714 F.2d 833, 835-36 (8th Cir. 1983) (emphasis added); <u>see also</u> <u>Pettit v. Apfel</u>, 218 F.3d 901, 902 (8th Cir. 2000) ("When considering whether the ALJ properly denied social security benefits to a claimant, we determine . . . whether the ALJ's decision is based on legal error."). Further, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of [our Court], to be exercised on the facts of individual cases." <u>Cf. Singleton v. Wulff</u>, 428 U.S. 106, 121, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976). And it is incumbent upon our Court to consider issues "where the proper resolution is beyond any doubt, or where 'injustice might otherwise result.' " <u>Id.</u> (citation omitted) (quoting <u>Hormel v. Helvering</u>, 312 U.S. 552, 557, 61 S. Ct. 719, 83 L. Ed. 1037 (1941)); <u>see also</u> <u>Hormel</u>, 312 U.S. at 557-59 (noting that "rules of fundamental justice" require a court to consider issues where "the lower court[] failed to give consideration to a phase of the case involving legal theories not presented" and "those in which there have been judicial interpretations of existing law after decision below and pending appeal— interpretations which if applied might have materially altered the result" (footnotes omitted)); <u>cf. Stafford v. Ford Motor Co.</u>, 790 F.2d 702, 706-07 (8th Cir. 1986) (remanding even when appellant failed to raise the issue in the district court, because the district court only analyzed whether appellant complied with one of two permissible procedures to exhaust internal union appeals). As described above, there is no doubt the ALJ's legal analysis is deficient and the majority's failure to reach the issue results in a severe miscarriage of justice for KKC, a minor whose father lost his life at age 35.

-17-

claimant's impairment, or combination of impairments, are "at least equal in severity and duration to the criteria of any listed impairment." Id. at 525 (quoting 20 C.F.R. §§ 404.1526(a), 416.926(a)).

Further, we have instructed ALJs to consider the Program Operations Manual System (POMS)[9] guidelines when determining equivalence, even though the POMS guidelines neither have "legal force" nor "bind the Commissioner." Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003). In the absence of a substantive analysis by the ALJ regarding medical equivalence, the record is insufficient for an analysis of whether substantial evidence supports the ALJ's decision. See, e.g., Hesseltine, 800 F.3d at 465-66; Chunn v. Barnhart, 397 F.3d 667, 672 (8th Cir. 2005).

Here, the ALJ did not analyze whether Carter's impairments medically equaled Listing 4.02, nor did the ALJ consider the POMS guidelines relating to cardiovascular impairments. The ALJ found Carter showed "no evidence of an impairment which . . . equal[ed] the criteria of a listed impairment or [] a combination of impairments equivalent in severity . . . to a listed impairment." (Emphasis added). Yet, the ALJ only analyzed the specific requirements of Listing 4.02. Given the failure of the ALJ to "provide the reasons for [the] conclusion" that Carter's impairment or combination of impairments did not medically equal Listing 4.02, we cannot say whether substantial evidence supported the ALJ's decision. Hesseltine, 800 F.3d at 466; see also Chunn, 397 F.3d at 672 ("The ALJ failed to support his finding . . . Chunn's impairments did not equal a listed impairment").

Further, the POMS guidelines directly undermine the ALJ's decision regarding medical equivalence. The ALJ implied that Carter's impairments did not medically

_____

[9]The POMS guidelines are "[i]nstructions for determining whether a person's combination of impairments . . . medically equal . . . a given listing." Hesseltine, 800 F.3d at 465.

equal Listing 4.02 because Carter "completed an exercise test in July 2010." But the POMS guidelines relating to cardiovascular impairments specifically note that, when conducting an " 'equals' analysis," an ALJ "must not presume [exercise test] results, or any other test results, are entitled to primary or extra weight." POMS § DI 32594.015(A)(2)(c). Instead, the POMS guidelines aver that an individual with heart failure may "equal" a listing "even where there is a[n] [exercise test] on file that does not meet the criteria." Id. § DI 32594.015(A)(2)(e) (emphasis added).

Contrary to the language in the POMS guidelines, the ALJ not only failed to conduct a separate analysis, but also relied almost exclusively on Carter's exercise test results as determinative that Carter's "congestive heart failure [was] not of a severity contemplated by [Listing] 4.02B." In light of the ALJ's perfunctory analysis, we are unable to evaluate whether substantial evidence supports the ALJ's finding that Carter's impairment, or combination of impairments, were not "equal" to Listing 4.02 and remand for reconsideration by the ALJ is necessary.

## B.     The ALJ's Failure to Fully and Fairly Develop the Record

The ALJ's decision also entitles KKC to a remand because the ALJ failed to fully and fairly develop the record for whether Carter met Listing 4.02 between December 2011 and the November 2012 hearing. "Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead, 360 F.3d at 838. "The ALJ's duty to develop the record extends even in cases . . . where an attorney represented the claimant at the administrative hearing." Id. When developing the record, "[t]he ALJ possesses no interest in denying benefits and must act neutrally in developing the record." Id.

To meet Listing 4.02, the regulations require, as relevant here, evidence of the following:

A.      Medically documented presence of . . . :

      1.   Systolic failure . . . with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability . . . .[10]

AND

B.      Resulting in one of the following:

      1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC . . . has concluded that the performance of an exercise test would present a significant risk to the individual; or
      2. . . . .
      3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due [to specified reasons.]

20 C.F.R pt. 404, subpt. P, App. 1, § 4.02.   With regard to Listing 4.02B, the record contains <u>no evidence</u> regarding Carter's ability to perform an exercise test at a workload equivalent to more than 5 METs, or whether the performance of an exercise

---

[10]As the majority holds, and the record evidence proves, Carter had systolic failure with an ejection fraction of 30 percent or less during a period of stability. In fact, repeated objective tests showed Carter had an ejection fraction between 20 percent and 9.1 percent during the relevant period. In spite of the undisputed evidence that Carter had a <u>severe</u> ejection fraction, the ALJ minimized the medical record stating Carter "<u>may</u> have an ejection fraction of 30 percent or less." This finding by the ALJ improperly minimized Carter's documented physical impairment and suggests the ALJ did not, in fact, clearly understand Carter's physical impairment.

test would have presented a significant risk to Carter, <u>between December 2011 and the November 2012 hearing</u>.

The record includes two exercise tests completed in July 2010 and December 2010 with a V02 max equivalency of 7.5 METs and 6 METs respectively. The ALJ particularly relied on the July 2010 exercise test as <u>conclusive</u> evidence Carter did not satisfy Listing 4.02B(1) and Listing 4.02B(3) for the <u>entire period</u>. But the July 2010 and December 2010 exercise tests became untimely "12 months after the date they [were] performed." 20 C.F.R. pt. 404, subpt. P, App. 1, § 4.00C(9)(a). After that date, both exercise tests may have provided important information for the ALJ, <u>id.</u>, § 4.00C(9)(b), but, an untimely test could <u>not</u> be treated as conclusive, <u>id.</u>, § 4.00C(9)(c).[11] Exercise tests are not, and should not be, treated as conclusive evidence after 12 months because congestive heart failure is a <u>progressive</u> disease and patients will, inevitably, get worse over time. <u>See</u> <u>Snead</u>, 360 F.3d at 837.

Here, the ALJ summarily used the July 2010 exercise test to decide Carter did not meet Listing 4.02B(1) and Listing 4.02B(3). The ALJ did so <u>even though</u> the test was untimely after July 2011. 20 C.F.R. pt. 404, subpt. P, App. 1, § 4.00C(9)(a).

---

[11]The majority concedes the July 2010 and December 2010 exercise tests were untimely 12 months after the date on which the tests were performed. (Maj. Op. 10 n.6). But the majority dismisses this gap in the evidentiary record, opining "the ALJ fairly concluded that the evidence before him was sufficient to determine that Carter was not disabled" for the <u>entire</u> relevant period. (<u>Id.</u> (citing 20 C.F.R. pt. 404, subpt. P, App. 1, § 4.00C(9)(d))). But, contrary to the majority's assertion, the ALJ could not "make a determination or decision based on the evidence" in the record, § 4.00C(9)(d), because of the <u>complete absence</u> of evidence regarding whether Carter could perform an exercise test at 5 METs or less between December 2011 and November 2012. <u>See</u> <u>id.</u>, § 4.00C(9)(a) (noting a test is only timely for 12 months); <u>see also</u> <u>Snead</u>, 360 F.3d at 838 ("Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.").

Further, the ALJ failed to consider the regulations indicating an exercise test will not be purchased if a medical consultant finds a claimant, like Carter, has "[a]n implanted cardiac defibrillator." Id., § 4.00C(8)(a)(iii).

Because the ALJ should have been aware Carter's exercise test results were untimely, the ALJ should have taken steps to either: (1) determine whether Carter could complete an exercise test above 5 METs after December 2011; or (2) determine whether performance of an exercise test after December 2011 presented a significant risk to Carter because Carter had an implanted cardiac defibrillator.[12] Carter's ability to complete an exercise test between December 2011 and the November 2012 hearing was an unexplored, dispositive issue with regard to Carter's entitlement to disability benefits. In the absence of this information, the only proper result is to remand the case for further development of the record.

## C.    The ALJ's RFC Analysis

Finally, even in the absence of the errors above, substantial evidence does not support the ALJ's RFC analysis.

---

[12]The majority asserts "[t]he record also is devoid of any evidence that a medical consultant had concluded that an exercise test would have presented a significant risk." (Maj. Op. 10 n.6). But Carter presented significant evidence that Carter had "[a]n implanted cardiac defibrillator" which, by definition, means an exercise test presented a "significant risk" to Carter. 20 C.F.R. pt. 404, subpt. P, App. 1, § 4.00C(8)(a)(iii). Further, the ALJ had an independent duty to determine whether a test after December 2011 would have presented a significant risk to Carter, because there is no evidence in the record to support the position that it was safe to perform an exercise test. See Snead, 360 F.3d at 838 ("[T]he ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.").

-22-

First, the ALJ erred by failing to include in the hypothetical posed to the vocational expert any reference to the employability of an individual with Carter's physical ailments combined with explosive disorder and social phobia. We have held that "[a] hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). But "[t]he hypothetical question must capture the concrete consequences of the claimant's deficiencies." Id. (emphasis added). "When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence." Id. at 626 (emphasis added).

Here, the ALJ specifically found Carter suffered from the "severe impairments . . . explosive disorder . . . and social phobia." Yet, nowhere in the ALJ's examination of the vocational expert did the ALJ ask about a hypothetical worker with Carter's physical ailments combined with explosive disorder and social phobia. In the absence of this examination, the testimony of the vocational expert is not substantial evidence of Carter's ability to work in the national economy and further proceedings are needed to determine the effect Carter's explosive disorder and social phobia had on his employability. See, e.g., Ekeland v. Bowen, 899 F.2d 719, 722 (8th Cir. 1990) ("This court often has held that testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence").

Second, to the limited extent the ALJ did ask the vocational expert about a hypothetical worker with Carter's physical ailments combined with "anxiety" or "mind . . . wondering," the vocational expert opined that the hypothetical worker would be unemployable if the conditions caused the worker to take more than "normal breaks." But, the ALJ disregarded the vocational expert's analysis regarding a hypothetical person with Carter's physical disability as well as "anxiety" or "mind

. . . wondering," instead relying upon the vocational expert's testimony that omitted <u>any</u> analysis of the combination of Carter's physical ailments and mental impairments. Therefore, in light of the complete absence of the ALJ's consideration of the combined impact of Carter's physical ailments and mental impairments, remand for additional proceedings is necessary.

Third, the ALJ's reliance on a report by Dr. Lawrence Staples (Dr. Staples) to determine Carter had an RFC to do sedentary jobs is unsupported by the ALJ's findings. While the ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence," <u>Roberts v. Apfel</u>, 222 F.3d 466, 469 (8th Cir. 2000), we have noted "a claimant's [RFC] is a medical question," <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001) (quoting <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000)). "[S]ome medical evidence" must support the determination of the claimant's RFC, <u>Dykes v. Apfel</u>, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace," <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000).

Here, the ALJ stated he gave "great weight" to Dr. Staples' opinion. Yet, the ALJ made multiple determinations inconsistent with Dr. Staples' report, including:

| Task | Dr. Staples' Opinion | ALJ's Opinion |
|---|---|---|
| ***Regularity of Lifting*** | <u>Frequently</u> lift 10 pounds. | <u>Occasionally</u> lift 10 pounds. |
| ***Frequency of Standing or Walking*** | Stand and/or walk for a total of at least <u>2 hours</u> in an 8-hour workday. | Stand and/or walk only <u>occasionally</u>. |
| ***Environmental Limits*** | Avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, and "hazards." May have unlimited exposure to extreme heat, wetness, humidity, noise, and vibration. | Avoid all temperature extremes, humidity, or dust—"must work in climate-controlled, indoor environment." |

In light of the ALJ's own findings, substantial evidence does not support giving "great weight" to Dr. Staples' opinion in determining Carter's RFC.

Fourth, in upholding the ALJ's RFC assessment, the majority relies heavily on the ALJ's findings that Carter was not disabled because Carter retained an ability to complete many activities of daily living. But we have consistently held that "the ability to do activities such as light housework and visiting with friends provides little if no support for the finding that a claimant can perform full-time competitive work." Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995); see also Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir. 1996) (finding it inappropriate to deny benefits on the grounds that the claimant could make the bed, prepare food, perform light housework, shop for groceries, and visit friends). Accordingly, Carter's performance of daily activities alone does not support the ALJ's conclusion that Carter was not entitled to disability benefits.

Finally, when analyzing an individual's RFC on appeal, I am of the view that this Court should take into account Carter's untimely death pending appeal of the ALJ's decision. New material evidence may be grounds for remand. Geigle v. Sullivan, 961 F.2d 1395, 1396 (8th Cir. 1992). The materiality inquiry requires determining whether the evidence relates to the time period for which the disability benefits were denied, and whether the evidence "is more than merely cumulative." Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008). Here, Carter's death, at age 35, is direct evidence of Carter's deteriorating condition over the relevant period and, in my view, may directly impact whether the ALJ finds Carter met Listing 4.02 between December 2011 and the November 2012 hearing.

## III. CONCLUSION

Having reviewed many social security disability cases regarding heart failure, a pattern has evolved whereby ALJs deny benefits to individuals because they are capable of "light work" or "sedentary work"—largely relying on the individual's ability to complete certain activities of daily living. See, e.g., Tomlinson v. Colvin,

No. C12-4038-MWB, 2013 WL 1093035 (N.D. Iowa Mar. 15, 2013); <u>Hathman v. Astrue</u>, No. 4:11 CV 1036 TCM, 2012 WL 4324408 (E.D. Mo. Sept. 20, 2012); <u>Brown v. Astrue</u>, No. 4:10 CV 1053 DDN, 2011 WL 4501094 (E.D. Mo. Sept. 28, 2011); <u>Davis v. Astrue</u>, No. 4:09 CV 934 CDP, 2010 WL 3719920 (E.D. Mo. Sept. 13, 2010). Such findings have the unfortunate result of denying benefits to individuals with heart failure unless the evidentiary record shows the individual is totally bedridden. See <u>Haggard v. Apfel</u>, 175 F.3d 591, 594 (8th Cir. 1999) ("[A] claimant need not be totally bedridden to be disabled"). Denying benefits to individuals simply because they are not bedridden is inconsistent with the purpose of the Social Security Act and I behoove ALJs to consider the impact of forcing individuals with severe heart failure to continue to work. See <u>Butler v. Flemming</u>, 288 F.2d 591, 595 (5th Cir. 1961) ("[T]he purpose of much social security legislation is to ameliorate some of these rigors that life imposes. Congress has in effect stated that if a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable . . . he shall be deemed to be disabled for the purposes of this Act.").

For the foregoing reasons, I would remand to the ALJ for a hearing consistent with this dissent. The ALJ has the responsibility to consider the nature of Carter's impairments, to fully and fairly develop the record, and then to decide whether Carter was entitled to disability benefits.

_____